**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**PERI & SONS FARMS, INC.**
**102 McLeod St.**
**Yerington, NV  89447**

**NATIONAL COUNCIL OF**
**  AGRICULTURAL EMPLOYERS**
**525 Ninth St., NW, Suite 800**
**Washington, DC  20004**

       **Plaintiffs**

       **v.**                          **Civil Action No. _____**

**R. ALEXANDER ACOSTA,**
**in his official capacity as**
**United States Secretary of Labor**
**200 Constitution Avenue, N.W.,**
**Washington, DC 20210**

**MOLLY E. CONWAY**
**in her official capacity as**
**Acting Assistant Secretary of Labor,**
**Employment and**
**  Training Administration**
**United States Department of Labor**
**200 Constitution Avenue, N.W.,**
**Washington DC 20210**

**BRYAN JARRETT,**
**in his official capacity as**
**Acting Administrator, Wage & Hour Division**
**United States Department of Labor**
**200 Constitution Avenue, N.W.,**
**Washington DC 20210**

**Defendants.**

**COMPLAINT AND PRAYER FOR DECLARATORY AND**
**INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiffs bring this action seeking emergency relief from the Department of Labor's plan to impose arbitrary and unsubstantiated cost increases on American farms and ranches.  The Department's actions are contrary to the directions and intentions of Congress and must be enjoined as soon as possible to avoid disastrous and irreparable outcomes.

2.      When Congress created the H-2A temporary agricultural nonimmigrant visa program, it specifically directed the Secretary of Labor to ensure that authorized employment of foreign agricultural workers would not "adversely affect the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1188(a)(1)(B).  Congress intended to avoid the potential for "wage depression" for U.S. workers by employers choosing foreign labor if it were less expensive than hiring U.S. workers "similarly employed."

3.      Despite this statutory mandate, the Department of Labor ("DOL") does not measure for and does not make specific findings as to the existence of "adverse effect" of H-2A employment on U.S. farmworkers.  The Department certainly does not conduct such an analysis focused on "similarly employed" farmworkers.  Instead, the Department simply sets a required minimum wage for H-2A contracts annually, regardless of occupation, experience, or skill, across an entire state or groups of two to six states combined.  DOL offers no explanation for why this wage is necessary, how this wage satisfies the statutory requirement, nor why any other wage rate, such as market or prevailing, would cause "adverse effect" to U.S. farmworkers similarly employed.  After decades of the H-2A program being in existence, and with the existing resources of its own wage-survey tools,

coupled with those of the Department of Agriculture, the Department of Labor should be able to measure for the existence and extent (if any) of this "wage depression."

4.     Under this approach, DOL has now established sudden and unsustainable disastrous increases in these erroneously named "adverse effect wage rates," scheduled to take effect this Wednesday, January 9, 2019, unless the Court intercedes and provides injunctive relief.  Plaintiffs respectfully urge the Court to provide this emergency relief so as to avoid the immediate and irreparable harm that these ruinous new rates will cause.

5.     Specifically, DOL published a Notice on December 26, 2018, mandating significant increases - up to 23% above 2018 levels - as the new "adverse effect wage rates," to take effect on January 9, 2019.  Department of Labor, Employment and Training Administration, *Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States:  2019 Adverse Effect Wage Rates for Non-Range Occupations*, 83 Fed. Reg. 66306 (Dec. 26, 2018) ("Notice"; attached hereto as Exhibit 1). It is this Notice that Plaintiffs ask the Court to enjoin.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); and 5 U.S.C. § 702 (providing for judicial review of agency action under the Administrative Procedure Act ("APA")).

**7.**     Venue in this judicial district is proper under 28 U.S.C. § 1391(e).

## III.     PARTIES

8.     Plaintiff, PERI & SONS FARMS, INC. ("Peri & Sons") is incorporated under the laws of the State of Nevada.  Peri & Sons farms approximately 15,000 acres in

and around Yerington, Lyon County, Nevada. *See* Declaration of Stephani L. Johnston at ¶ 3 ("Johnston Decl."; attached hereto as Exhibit 4). This labor-intensive farming includes such crops as fresh-market onions, including, red, white, sweet, and yellow onion varieties, organic leafy greens, such as baby spinach, spring mix, broccoli, and cauliflower, and rotational forage crops like alfalfa and triticale. *Id.* This work is highly seasonal and requires far more labor than is available in the community, forcing Peri & Sons to rely on the H-2A temporary agricultural labor program to meet its farm labor needs - without the H-2A program, Peri & Sons could not continue to operate its business. *Id.* at ¶¶ 4-5. At the peak of the 2018 growing season, Peri & Sons employed 1,768 H-2A workers, making it one of the largest fixed-site H-2A employers in the country. *Id.* Peri & Sons currently has 240 H-2A workers on payroll, making any wage changes dictated by the Department of Labor effective immediately; hundreds of additional workers will be arriving in the coming weeks and months as the growing season ramps up. *Id.* at ¶ 7.

9.     Plaintiff National Council of Agricultural Employers ("NCAE") is a national association organized under the laws of the District of Columbia. Founded in 1964, NCAE is the only national association focusing exclusively on agricultural labor issues from the agricultural employer's viewpoint. *See* Declaration of Michael Marsh at ¶¶ 3-4 ("Marsh Decl."; attached hereto as Exhibit 5). NCAE represents labor-intensive agriculture before Congress, with federal agencies and, where necessary, in court. *Id.* Its members are growers, associations, and others whose business interests depend on labor-intensive agriculture. *Id.* NCAE's membership, including farmers represented by its association members, represents an estimated two-thirds of all U.S. agricultural employers directly engaged in the production of food and nursery crops in the United States, and 85%

of H-2A employers.  *Id.* at ¶ 4.  Many of the growers and processors represented by NCAE make use of the H-2A temporary nonimmigrant visa programs to meet their temporary or seasonal labor needs.  *Id.* at ¶____.  NCAE brings this action on behalf of its H-2A employer members and the H-2A employer-members of its member associations.

10.     Defendant R. Alexander Acosta is the United States Secretary of Labor ("Secretary Acosta" or "the Secretary").  The Secretary is responsible for all functions of the DOL, including the Office of Foreign Labor Certification within the Employment and Training Administration, which issues H-2A labor certifications and sets the adverse effect wage rate, as well as the Wage and Hour Division that enforces that rate.  Secretary Acosta is sued in his official capacity; he is an official resident of Washington, D.C. and the AEWR Notice issued out of Washington, D.C.

11.     Defendant Molly E. Conway is the Acting Assistant Secretary of Labor for the Employment and Training Administration ("ETA").  She issued the Notice and ETA's Office of Foreign Labor Certification requires employers to attest that they will pay the adverse effect wage rate published annually by ETA.  Acting Assistant Secretary Conway is sued in her official capacity; she is an official resident of Washington, D.C. and she issued the AEWR Notice from Washington, D.C.

12.     Defendant Bryan Jarrett is the Acting Administrator of the Department of Labor's Wage & Hour Division ("WHD").  WHD is responsible, *inter alia*, for enforcing the terms and conditions of H-2A labor certifications issued by ETA.  Plaintiffs seek to enjoin WHD from enforcing the terms of the Notice issued by ETA on December 26, 2018.  Acting Administrator Jarrett is sued in his official capacity; he is an official resident of Washington, D.C. and the AEWR Notice issued out of Washington, D.C.

## IV.    LEGAL BACKGROUND

13.    Congress created the H-2A program when it amended the Immigration and Nationality Act through the Immigration Reform and Control Act of 1986.  In order for the Department of Labor to issue a labor certification permitting an employer to hire H-2A agricultural workers, the Secretary must make two findings:

- "there are not sufficient [domestic] workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
- "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed."

8 U.S.C. § 1188(a)(1)(A), (B).

14.    DOL rigorously tests the first element of this test - setting forth a number of requirements for H-2A employers regarding advertising, recruiting, and hiring all "able, willing, and qualified" U.S. applicants for the farmworker position(s) in question.  *See, e.g.,*  20 C.F.R. § 655.135 (hiring requirement, recruitment requirements, "50% rule" requiring employers to hire U.S. applicants through the first half of the contract period, regardless of whether an H-2A workers is already in the temporary position, etc.); 20 C.F.R. §§ 655.150-158 (posting job opportunities on interstate clearance system; newspaper advertisements; contacting former employees; additional "positive recruitment"; referrals of workers from state workforce agencies; submitting detailed recruitment reports of efforts and results).

15.    For the second statutory element, however, the Department offers no means for testing the existence of "adverse effect" and no data that such an effect exists.  No effort is made to test for the existence (much less the extent, if any) of the "adverse effect" on U.S. workers as a result of employers hiring H-2A workers.

16.     Instead, the Department of Labor assumes adverse effect and requires an AEWR.  The Department's erroneously named "Adverse Effect Wage Rate" ("AEWR") is simply a premium wage for foreign workers, derived from a weighted average across all agricultural work by state or region based on survey data obtained by the U.S. Department of Agriculture's National Agricultural Statistical Service's Farm Labor Survey ("USDA"; "NASS"; and "FLS").  The FLS collects voluntary responses on a semiannual basis, collecting "total wages paid" - which includes overtime payments, performance bonuses, and piece-rate incentive pay earnings, rather than purely hourly wages.

17.     Employers must pay the highest of the AEWR, any collectively bargained wage rate, the state or federal minimum wage, or the state prevailing wage for that crop or occupation, of which the AEWR is almost always the highest of the group.  20 C.F.R. § 655.120.  Thus, beyond making an industry-wide and often multistate average into a minimum, contrary to the statutory requirements, DOL does not evaluate whether any "adverse effect" exists whatsoever, much less for any worker "similarly employed" as any particular H-2A worker.

18.     While the Department of Labor may argue that setting an artificially high minimum wage is intended to prevent "wage depression" or "adverse effect" before it can appear, imposing these wages presumes (without a scintilla of proof) that the employment of H-2A workers is already having an "adverse effect" on the local U.S. workforce or would result in such harm without requiring such high wage levels.  There is even less proof that the particular wage rates chosen by the Department are calculated to avoid "adverse effect" without being unduly burdensome – *e.g.,* requiring wages of $100/hour

for all farmworkers would, arguably, not decrease the wages of U.S. farmworkers in the short-run but would be ruinously high and decimate American agriculture.

19.     From Fiscal Year ("FY") 2005 through FY 2018, the number of H-2A temporary or seasonal agricultural worker positions certified by the Department of Labor grew from 48,336 to 242,762, more than 400% growth over that period.[1]  But these jobs are, by definition, of relatively brief duration (averaging just over 5 months);  USDA calculates H-2A employment as 108,000 full-time equivalents ("FTEs") or about 8% of the 1.3 million FTEs in agriculture.[2]  Other estimates range from 1.5 million to as many as 3 or 4 million individual farmworkers, but even at the most conservative 1.3 million, FTEs, H-2A employment is a miniscule proportion of the total agricultural labor workforce in America.

20.     It is difficult if not impossible to imagine how so few H-2A workers, in comparison to the total agricultural labor force, could possibly affect the wages and working conditions of domestic farmworkers.  The relatively small number of H-2A workers, even with significant increases in participation in the program in recent years, would not appreciably lower domestic wages, regardless of the rate-of-pay for this handful of H-2A workers.  Indeed, neither the Department of Labor nor the Department of Agriculture can point to any such "wage depression" for domestic farmworkers attributable to H-2A employment.

21.     If the growth in H-2A program participation has had <u>any</u> effect on domestic farmworker wages (which, again, is unlikely to impossible), it has been to drive those

---

[1] https://www.ers.usda.gov/webdocs/charts/86845/h2apositions2018_d.html?v=8704.4
[2]  https://www.ers.usda.gov/topics/farm-economy/farm-labor/#h2a

domestic wages <u>upward</u> because of how the Department of Labor implements its "adverse effect wage rate" methodology.  Knowing that H-2A employers are required to hire all qualified, willing, and able U.S. applicants through the 50% point of the contract (*see, supra*, 20 C.F.R. § 655.135(d)), non-H-2A employers may need to raise their wages to the artificially high AEWR levels to keep their employees from leaving for H-2A employers. But given the relative size of the H-2A workforce and domestic workforce, the most likely effect of H-2A employment is no effect at all.

22.     Department of Agriculture data, using inflation-adjusted dollars, shows that farmworker hourly wages have increased steadily and by a significant measure over the past 30 years since Congress created the H-2A program in 1986.[3]



---

[3] https://www.ers.usda.gov/topics/farm-economy/farm-labor/#size

This steady wage growth for farmworkers in the United States is, if anything, the exception and not the rule in the economy at large.  Over the past 10 years, in inflation-adjusted terms, the AEWR has increased by 1.03% per year, compared to only 0.66% for non-farm wages; over the past 15 years, AEWR has grown by 0.73% annually, compared with just 0.50% per year for non-farm wages.  Marsh Decl. at ¶ 12.  These 0.3% and 0.25% annual differences compound and reflect consistently more robust growth in farmworker wages than the rest of the economy, even at a time when H-2A usage has grown by a factor of 5x. *Id.*

23.    Thus, as the Department of Labor continues to fail to test for actual "adverse effect" on domestic farmworker wages, and as H-2A participation continues to increase, the wages of domestic farmworkers show growth and neither "wage depression" nor "adverse effect" from the employment of H-2A workers.

24.    The Department's failure to assess the existence or scope of "adverse effect" is greatly compounded by its implementation of the erroneously named "adverse effect wage rate" system for setting minimum wages for the H-2A visa program.  The Department's insistence that H-2A employers pay a premium wage without finding that paying a different wage would "adversely affect the wages and working conditions of workers in the United States similarly employed" violates the terms of the H-2A program that Congress set forth and amounts to "arbitrary and capricious" agency action.  Regardless of how scrupulously the Department of Agriculture surveys farmworker wages through the FLS, the critical step of assessing whether H-2A employment actually has an "adverse effect" on those wages by the Department of Labor using those surveys is missing.

25.     And this gap in analysis is no mere academic exercise.  On December 26, 2018, the Department of Labor published a Notice setting forth the 2019 AEWRs that will take effect this Wednesday, January 9, 2019.  Ex. 1.  In the Notice, the Department of Labor proposes to increase the AEWR by as much as 15%, 16%, or 23% over 2018 levels for H-2A employment in the Mountain West, with increases of 7% to 9% in the Mid-Atlantic states.  *Compare* Exhibit 1 *with* the 2018 AEWR Notice, published at 82 Fed. Reg. 60628 (Dec. 21, 2017) ("2018 Notice"; attached hereto as Exhibit 2); *see also*, Department of Labor table showing state-by-state changes to AEWR from 2013-2019 (attached hereto as Exhibit 3).

26.     By merely republishing the USDA NASS FLS data, the Department of Labor has failed to demonstrate that H-2A employment has <u>any</u> "adverse effect" whatsoever on the "wages and working conditions of workers in the United States similarly employed," as required by Congress in 8 U.S.C. § 1188(a)(1)(B).  The Department nevertheless plans to impose arbitrary, unsubstantiated, and ruinously high wage increases on H-2A farmers.  This is contrary to the consistent evidence of wage <u>growth</u> among U.S. farmworkers - those supposedly "adversely affected" by the presence of H-2A workers.

27.     In the past, the Department of Labor has acknowledged the problems with using FLS data to set one-size-fits-all minimum wages across all agricultural employment in multistate regions.  "Wages vary across the U.S. by geographic location, by specific agricultural occupation, and by level of skill.  An AEWR that does not take into account these variables will inevitably disrupt program functionality and adversely affect U.S. workers."  Department of Labor, Employment and Training Administration, *Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor*

*Certification Process and Enforcement; Proposed Rule*, 73 Fed. Reg. 8538, 8550 (Feb. 13, 2008) (attached hereto as Exhibit 6).  "Another important element in determining an appropriate AEWR that reflects market realities and labor costs is including wage data relating to the specific occupation and level of skill or experience required for a position. Farm labor comprises a number of occupations and skills, and both the demand for and supply of farm workers with a particular skill level or experience varies significantly across geographic areas."  *Id.*  With these concerns in mind, the Department of Labor stated unequivocally, "The Department[ of Labor's] reliance on USDA Farm Labor Survey data creates several problems for functional program administration."  *Id.*  Namely, the lack of refined data as to skill, experience, location, or the other factors enumerated above.  *Id.* Because these data are not measured by the USDA survey, the Department of Labor cannot use the survey to determine the presence or absence of "adverse effect" to comply with the statutory requirement.[4]

28.     Although DOL, in its 2008 notice of proposed rulemaking, is clearly cognizant of the limitations and potential for erroneously-dictated AEWRs when using FLS data alone – without refinement or without testing for actual "adverse effect" – another decade has passed without DOL curing these problems.  Instead, with full knowledge of the problems inherent to its current methodology; with abundant evidence that H-2A employment is <u>not</u> adversely affecting U.S. farmworker wages or working conditions (indeed, could not possibly cause such an effect, given the relative sizes of the U.S. and H-2A workforces); and with evidence of ever-increasing U.S. farmworker wages, the

---

[4] This is not to suggest that the Farm Labor Survey is flawed for what it is.  The FLS was never intended for the purpose to which DOL now uses it.  Rather, this is to note gaps in the Department of Labor's efforts to comply with its statutory mandate.

Department of Labor nevertheless continues to impose AEWRs that bear no logical connection to any actual "adverse effect" on U.S. workers.

29.     Moreover, if the policy objective is to ensure that employing H-2A workers is not less expensive for farmers than employing domestic farmworkers "similarly situated," then the Department of Labor's use of the FLS data omits key information that would be necessary to conduct an "apples-to-apples" comparison. For example, employers of non-H-2A farmworkers are not required to provide housing to their workers, let alone free housing. The H-2A program requires that "[e]mployers shall furnish housing in accordance with regulations," 8 U.S.C. § 1188(c)(4), and the Department of Labor's H-2A regulations require that "[t]he employer must provide housing at no cost to the H-2A workers and those workers in corresponding employment who are not reasonably able to return to their residence within the same day." 20 C.F.R. § 655.122(d)(1). DOL regulations also require employers to provide free transportation to H-2A workers, to and from their place of recruitment *(e.g.*, the U.S. consulate in their home country) to the worksite, as well as local transportation between the employer-provided housing and the worksite. 20 C.F.R. § 655.122(h).

30.     These costs vary by employer and by area - housing prices are higher or lower and the cost of transportation from Mexico or other foreign countries differ by location. Some examples of the range of these costs are included in the exhibits attached hereto, however.

- Peri & Sons: **$2.15/hour** (Johnston Decl. at ¶ 12)
- Tagawa Greenhouse: **$2.74/hour** (Declaration of William A. Kluth at ¶ 9; attached hereto as Exhibit 7)
- Other NCAE members report per-worker/per-hour fixed costs of **$4.00/hour** or more (Marsh Decl. at ¶ 10).

Thus, the FLS data about domestic farmworkers' <u>gross</u> pay rates are misleading, since: (1) a substantial portion of that money is earmarked for rent, mortgage, or other expenses that H-2A employers pay on top of the hourly wage rate but that non-H-2A workers must bear, themselves; and (2) this additional $2 to $4 per hour makes clear that H-2A workers are never "cheaper" than U.S. workers, conclusively negating any inference of "adverse effect."[5]

31.    But the Department of Labor neither asks USDA NASS to survey for these additional expenses, nor does it assess them itself. This is no minor lacuna, this is a glaring omission for an agency tasked by Congress with making a finding on this precise issue. Requiring H-2A employers to pay the unsubstantiated and erroneous AEWRs included in the December 26th Notice would violate Congress' directions to the Department of Labor and constitute impermissibly arbitrary and capricious agency behavior under the APA. 5 U.S.C. § 706(2)(A) and (C).

32.    NCAE and the H-2A community, at large, have sought to address these issues for many years through Congress and come before this Court now only as a last resort. Every legislative proposal to address the H-2A program has had two common elements: (1) it recognized the lack of "adverse effect" and sought to fundamentally revise the wage-setting structure of the program; and (2) it came up short of enactment as it fell victim to a decades-long policy battle over larger immigration issues that have kept Congress from enacting meaningful reforms. From AgJobs in 2002 to the Senate-passed

---

[5] There are also concerns that the NASS-FLS data set includes "gross wages" and, thus, improperly includes or double-counts overtime wages and/or piece-rate or other incentive pay, making the "hourly" wage derived from this information artificially high. But the core problem is the lack of any finding of actual "adverse effect" in the first instance.

S.744 in 2013 to H.R. 4760 in the House of Representatives in the most recent Congress, each piece of H-2A reform legislation has proposed replacing the Department of Labor's AEWR structure in its entirety.

33.    Since Congress and the Department of Labor have failed to correct this problem, Plaintiffs are now forced to seek relief from the Court in this matter.  Without the Court's assistance, this unsubstantiated, unlawful, and arbitrary and capricious agency action will have immediate and disastrous effects for American farms.

## V.    IRREPARABLE HARM

34.    The announced AEWR increases are legally indefensible absent a showing of actual adverse effect, but are particularly vexing in the three USDA regions in the Mountain West:

- Mountain I:  Idaho, Montana, and Wyoming  (+15.9%)
- Mountain II:  Colorado, Nevada, and Utah  (+22.8%)
- Mountain III:  Arizona and New Mexico  (+14.7%)

*See* Ex.3 (DOL 2018 vs. 2019 AEWR change table).

35.    With no finding that any U.S. workers would be adversely affected by H-2A workers being paid at 2018 wage levels (or, indeed, at any wage level other than the ones in the Notice), the Department of Labor is turning farms from profitable to unprofitable with the stroke of a pen along the spine of the American West in a vast swath from Canada to Mexico.  Millions and millions of dollars of additional labor costs will be imposed overnight, without any commensurate increases in crop prices or, in most cases, any ability to pass on these massive cost increases to customers whatsoever.  This comes at the worst possible time, as U.S. farms face unfair retaliatory tariffs that are already restricting markets and reducing crop prices.  Marsh Decl. at ¶ 14.

36.     If injunctive relief is not granted and employers pay these suddenly increased wage rates beginning this week, a future ruling against the Department of Labor's actions will be cold comfort to these farms, even if they are able to remain in operation. Once wages are paid, they will never be returned. On the other hand, if the Court were to grant temporary or preliminary injunctive relief but ultimately side with the Department's position, any wages owed under the Notice could be paid at that time without delay.

37.     Agricultural employers will face an impossible choice for 2019 – participate in the H-2A program and incur extreme economic losses and possibly lose the family farm or breach contracts with customers and suffer reputational damage; either loss is permanent and utterly irreparable. Marsh Decl. at ¶ 15.

38.     Thus, the balance of equities weighs strongly in the favor of preserving the status quo and affording these agricultural employers at least temporary or preliminary injunctive relief while this issue can be litigated fully.[6]

## VI.     CLAIMS

### Count I

### The Department of Labor Is Acting in Violation of 8 U.S.C. § 1188(a)(1)(B) (5 U.S.C. § 706(2)(A), (C))

39.     Plaintiff incorporates by reference the allegations set forth in ¶¶ 1-38, above.

---

[6] As discussed in greater detail in the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support thereof, in light of the current "lapse in appropriations" or government "shutdown," there is a legitimate concern that a brief delay could result in a prolonged delay before relief might be obtained. The unique timing of the Notice, impending effective date, and the filing of this action are prime examples of where "justice delayed is justice denied," particularly given the uncertain nature of any agreement between Congress and the Administration on appropriations.

40.     The Administrative Procedure Act does not permit an agency to act in a manner that is "not in accordance with law" 5 U.S.C. § 706(2)(A), nor "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

41.     The Department of Labor seeks to impose significantly higher labor costs through the 2019 AEWR Notice without acting in accordance with the INA's requirement to find adverse effect and beyond the authority provided to it by Congress with respect to setting the terms and conditions of H-2A employment.

42.     Since the Department's actions are not supported by and, indeed, are contrary to statutory authority, the Department of Labor's Notice of December 26, 2018 must be vacated and withdrawn, and the Department enjoined from requiring employers to pay any AEWR in excess of the 2018 AEWR until such time as the Department makes specific findings of actual adverse effect.

### Count II

**The 2019 AEWRs in the December 26, 2018 Notice Are
Arbitrary and Capricious by Failing to Consider
Essential Information Related to Labor Costs**

**(5 U.S.C. § 706(2)(A))**

43.     Plaintiff incorporates by reference the allegations set forth in ¶¶ 1-42 above.

44.     The Administrative Procedure Act does not permit agencies to act in a manner that is "arbitrary and capricious."  5 U.S.C. § 706(2)(A).  Any attempt to assess "adverse effect" that does not look to those "similarly situated," that does not take into consideration differences in geographic areas, occupation, skills, or experience, and that

does not consider additional Department-mandated costs of H-2A employment above and beyond the required AEWR is, by definition, arbitrary and capricious.

45.     As a result, the Notice must be vacated and withdrawn, and the Department enjoined from requiring employers to pay any AEWR in excess of the 2018 AEWR until such time as the Department makes specific findings of actual adverse effect that include these essential factors in such an analysis of whether any "adverse effect" exists as a result of employing H-2A workers.

**WHEREFORE, Plaintiffs pray that the Court:**

46.     Enter a temporary restraining order and preliminary injunction, pending a decision on the merits, enjoining the Defendants from: (i) implementing the 2019 AEWR Notice, 83 Fed. Reg. 86306 (Dec. 26, 2018); (ii) from issuing any further AEWR notices that do not include a finding of actual "adverse effect" or that do not consider geographic areas, occupation, skills, or experience; and (iii) from enforcing the wage rates set forth in the Notice against any employer;

47.     Enter a declaratory judgment as to Counts I and II that the 2019 AEWR Notice is invalid, and enter an order vacating the Notice and permanently enjoining Defendants from implementing it;

48.     Award Plaintiffs their costs and expenses, including reasonable attorney's fees whether under the Equal Access to Justice Act or otherwise; and

49.     Award such further and additional relief as is just and proper.


Dated:  January 7, 2019                    /s/  Christopher J. Schulte
                                           CHRISTOPHER J. SCHULTE, ESQ.
                                           (D.C. Bar # 500878)
                                           CJ LAKE, LLC

18

525 Ninth Street, N.W., Suite 800
Washington, DC 20004
Telephone: 202.465.3000
Facsimile: 202.347.3664
E-Mail:  cschulte@cj-lake.com

BRAD M. JOHNSTON, ESQ.
(*Pro Hac Vice* Application Forthcoming)
JOHNSTON LAW OFFICES, P.C.
22 State Route 208
Yerington, NV  89447
Telephone:  775.463.9500
Facsimile:  775.463.4032
E-Mail:  bjohnston@johnstonlawoffices.co

*Counsel for Plaintiffs*